# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

| | |
|---|---|
| Z. M-D b/n/f THERESE MENZIA, § | |
| *Plaintiffs* § | |
| § | |
| v. § | Case No. 1:19-CV-991-LY |
| § | |
| AUSTIN INDEPENDENT SCHOOL § | |
| DISTRICT, § | |
| *Defendant* | |

## REPORT AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

**TO: THE HONORABLE LEE YEAKEL**
**UNITED STATES DISTRICT JUDGE**

Before the Court are Defendant's Motion to Dismiss Plaintiff's First Amended Complaint Pursuant to Rules 12(b)(6), filed April 20, 2020 (Dkt. 21); Plaintiff's Response, filed May 18, 2020 (Dkt. 24); and Defendant's Reply, filed May 26, 2020 (Dkt. 26). On May 19, 2020, the District Court referred the motion to the undersigned Magistrate Judge for report and recommendation, pursuant to 28 U.S.C. § 636(b)(1), Federal Rule of Civil Procedure 72, and Rule 1 of Appendix C of the Local Rules of the United States District Court for the Western District of Texas. Dkt. 25.

## I.  Background

On October 11, 2019, Therese Menzia, as next of friend to her minor daughter Z. M-D. ("Z")[1] (collectively, "Plaintiffs"), filed this discrimination lawsuit against Austin Independent School District ("AISD"). Z, who identifies as "a person of color" and of "mixed heritage" (her mother is from Cameroon and her father is from Brazil), immigrated to the United States with her family when she was nine years old. Dkt. 17 ¶ 25. From August 2017 through December 2017, Z attended

---

[1] Z. M-D. was born on November 3, 2006. Dkt. 17 ¶ 25.

Martin Middle School ("MMS"), in Austin, Texas, and within AISD boundaries. Plaintiffs allege that while she was a student at MMS, a group of female students (hereinafter, "the Harassers") bullied and harassed Z because of her race, ethnicity, and "the fact that she born outside of the United States." *Id.* ¶ 26. Specifically, Plaintiffs allege that the Harassers verbally harassed and bullied Z "on a daily basis" by telling her that she was "different" and smelled "bad," that she should "go back where she came from," and calling her racist and offensive names, including "bitch," "nigger," and "African Booty Snatcher." *Id.* ¶¶ 27-30. Plaintiffs also allege that the Harassers physically bullied and harassed Z by pushing, pulling, and slapping her, and by spraying perfume in her face.

Plaintiffs contend that the bullying and harassment continued even after Z complained to three different teachers and the school counselor. Plaintiffs further contend that Z went to the office of Principal Lopez[2] on multiple occasions, "but the secretary always told her, he would get back with her, but he never did." *Id.* ¶ 37. Plaintiffs also aver that no one at MMS, including Principal Lopez, ever referred the matter to AISD's "Title VI[3] Coordinator," Superintendent, or designees. *Id.* ¶ 52.

On September 26, 2017, Menzia met with Principal Lopez to complain about the bullying and harassment of Z "because of her race, nationality and because she wasn't born in America." *Id.* ¶ 39. Plaintiffs allege that although Principal Lopez told Menzia that the bullying would be addressed, he failed to do anything to stop it, and it continued.

On October 13, 2017, the school counselor called Menzia to inform her that Z "was having a problem at school and wanted her mother to come to the school." *Id.* ¶ 42. When she arrived at the

---

[2] Plaintiffs do not refer to "Principal Lopez" by his full name in their pleadings. In addition, while Plaintiffs primarily refer to Lopez as "Principal Lopez," they also refer to him as "Vice-Principal." *See* Dkt. 17 ¶ 45. AISD does not dispute that Lopez was the Principal of MMS, so the Court assumes that the reference to Vice-Principal was a typographical error.

[3] Title VI refers to Title VI of the Civil Rights Act of 1964.

school, Menzia was told that Z had rated "high on the suicide survey," and that the school would contact Menzia to set up a counseling appointment. *Id.* ¶ 43. Menzia contends that she was never contacted about counseling.

Plaintiffs allege that On October 17, 2017, the Harassers taunted Z as she attempted to walk through the school gymnasium, and that in "an effort to protect herself she got into a physical altercation and was pushed into a wall." *Id.* ¶ 44. Plaintiffs complain that although the school was aware of the prior bullying of Z by the Harassers, MMS punished Z for the incident by charging her with Assault with Injury, and ordered that she be suspended for three days and then sent to the AISD Alternative Leaning Center ("ALC"). Plaintiffs also allege that Principal Lopez blamed Z for the incident and said to her "who is the bully now." *Id.* ¶ 45. Plaintiffs allege that Menzia once again requested an investigation into the bullying, but a proper investigation was never conducted. Menzia acknowledges, however, that she eventually received a letter from Principal Lopez stating that the conduct by the Harassers did not constitute bullying or harassment as defined by law.

After this incident, Z's depression worsened, and she attempted to cut herself with a pair of scissors. On October 21, 2017, Z was admitted to Shoal Creek Hospital for a psychiatric evaluation and treatment for her depression and suicidal ideation. Plaintiffs allege that when she was released from the hospital, one of her attending physicians wrote a letter stating that Z was admitted "due to mental health concerns in the context of bullying at Martin Middle School" and that he had "concerns with the current status at Martin Middle School and encourage[d] the administration to continue to investigate the bullying allegations as this situation directly affected Z. M-D.'s emotional state and well-being." *Id.* ¶ 48.

After Z was released from Shoal Creek Hospital, Menzia asked Principal Lopez if Z could transfer to another public school instead of attending the ALC. Principal Lopez denied her request,

and Menzia appealed. The AISD Hearing Officer ruled that Z's seven-day stay at Shoal Creek Hospital would be deemed "time served," and that Z did not have to attend the ALC. Plaintiffs allege that when Z returned to MMS, the bullying and harassment worsened.

In mid-November 2017, the Austin chapter of the NAACP sent a letter to MMS requesting that Z be transferred to another school to avoid the "very dangerous environment." *Id.* ¶ 58. On December 18, 2017, Z was transferred to another AISD middle school.

On January 23, 2018, Menzia received a letter from Paul Perez, AISD Assistant Director for Student Services/Student Discipline, informing her that the assault charge had been deleted from Z's record. Plaintiffs allege, however, that the school never addressed the ongoing bullying and harassment.

On October 11, 2019, Plaintiffs filed this lawsuit against AISD, alleging that AISD failed to train staff, address complaints, and remedy the effects of the alleged bullying and harassment of Z due to her race and national origin. In their First Amended Complaint, Plaintiffs allege that AISD's actions and failure to act violated Title VI of the Civil Rights Act of 1964 and Z's Fourteenth Amendment rights, in violation of 42 U.S.C. § 1983. In its Motion to Dismiss, AISD argues that Plaintiffs have failed to state a claim for relief under Federal Rule of Civil Procedure 12(b)(6).

## II. Legal Standard

Federal Rule of Civil Procedure 12(b)(6) allows a party to move to dismiss an action for failure to state a claim on which relief can be granted. In deciding a Rule 12(b)(6) motion to dismiss for failure to state a claim, the court "accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (internal quotation marks omitted). The Supreme Court has explained that a complaint must contain sufficient factual matter "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570

(2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 556 U.S. at 678.

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

*Twombly*, 550 U.S. at 555 (cleaned up). The court's review is limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint. *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010).

### III.   Analysis

**A.  Title VI**

Section 601 of Title VI of the Civil Rights Act of 1964 ("Title VI") provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Title VI prohibits "only intentional discrimination." *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001). Accordingly, a Title VI plaintiff must prove discriminatory intent in order to recover compensatory damages. *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 408 (5th Cir. 2015).

Plaintiffs allege that AISD violated Title VI because MMS school officials knew that Z was being bullied, harassed, and physically assaulted by other students because of her race, but failed to protect her from such racial discrimination. Specifically, Plaintiffs complain that AISD violated Title VI by failing to notify the AISD Title VI Coordinator or the Superintendent of the harassment;

5

provide Z with school-based counseling services or an aide/shadow while at school; implement appropriate safety measures to address the bullying and provide a safe environment for Z; properly investigate Plaintiffs' complaints and stop the bullying and harassment of Z; meet with Z and the Harassers to address the harassment; and train students and staff on issues of race, mixed heritage, and Title VI.

Because Plaintiffs do not allege a discriminatory policy by AISD in violation of Title VI, "they must plausibly allege that an 'appropriate person' in the district—i.e., someone who could take corrective measures—had 'actual knowledge' of intentional discrimination yet responded with 'deliberate indifference.'" *Bhombal v. Irving Indep. Sch. Dist.*, 809 F. App'x 233, 237 (5th Cir. 2020) (quoting *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998)).[4] Under this standard, a school district may be liable under Title VI for student-on-student harassment if:

> (1) the harassment was "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to educational opportunities or benefits provided by the school" (a racially hostile environment), and the district (2) had actual knowledge, (3) had "control over the harasser and the environment in which the harassment occurs," and (4) was deliberately indifferent.

*Fennell*, 804 F.3d at 408 (quoting *Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 650 (1999)). In this case, the parties dispute only whether a racially hostile environment existed and whether AISD was deliberately indifferent to that environment. The Court addresses each in turn.

---

[4]Although *Gebser* was a Title IX case, the Supreme Court's Title IX analysis "directly informs" the Title VI analysis. *Fennell*, 804 F.3d at 408 (citation omitted); *see also Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 258 (2009) (explaining that "Congress modeled Title IX after Title VI"). Thus, AISD's argument in its Reply brief that Plaintiffs' reliance on cases interpreting Title IX is "misplaced" is not well-taken. *See* Dkt. 26 at 4 n.1.

1. **Racially Hostile Environment**

Whether racially oriented conduct rises to the level of actionable harassment "depends on a constellation of surrounding circumstances, expectations, and relationships including, but not limited to, the ages of the harasser and the victim and the number of individuals involved." *Davis*, 526 U.S. at 651. For student-on-student harassment to be considered "severe, pervasive, and objectively offensive," *id.* at 650, "the harassment must be more than the sort of teasing and bullying that generally takes place in schools." *Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 167 (5th Cir. 2011). "There is no question, though, that repeatedly being referred to by one's peers by the most noxious racial epithet in the contemporary American lexicon, [and] being shamed and humiliated on the basis of one's race is harassment far beyond normal schoolyard teasing and bullying." *Fennell*, 804 F.3d at 409 (internal quotation marks omitted). This is precisely what happened to Z.

As noted, Plaintiffs allege that the Harassers bullied and harassed Z on "a daily basis" and "frequently" called her "nigger" and "African Booty Snatcher," told her "to go back where you came from," and "made comments about her mother being from Africa." Dkt. 17 ¶¶ 28-30. These allegations are clearly sufficient to show that a plausible racially hostile environment existed. *See Fennell*, 804 F.3d at 409 (holding that plaintiffs raised a genuine dispute that a racially hostile environment existed at school where student repeatedly was referred to as "nigger" and "stupid nigger").

AISD argues that the alleged harassment and bullying of Z by fellow students was not pervasive because it "occurred over the span of only three months" and, therefore, was "mere periodic or sporadic harassment." Dkt. 21 at 14. The Court disagrees, and finds that the racially offensive remarks and actions that were made *on a daily basis* over a three-month span were

sufficiently regular and continuous to constitute "severe, pervasive and objectively offensive" harassment. *Davis*, 526 U.S. at 653 (finding that allegations that student was the victim of repeated acts of sexual harassment over a five-month period was "severe, pervasive, and objectively offensive" conduct); *DiStiso v. Cook*, 691 F.3d 226, 243 (2d Cir. 2012) (noting that use of the word "nigger" approximately eight to fifteen times over a single school year raised a question as to whether the name-calling was severe or pervasive); *Sanches*, 647 F.3d at 165 (noting that a student was the victim of a hostile sexual environment where she was called a variety of pejorative epithets daily, including "bitch," "dyke," and "freak," taunted as the "lesbian lover" of another female student, and constantly threatened with physical harm); *Walker v. Thompson*, 214 F.3d 615, 626 (5th Cir. 2000) (holding that racially offensive remarks made every few months over three years was sufficient to raise a genuine dispute of whether a hostile environment exists under Title VII), *abrogated on other grounds by Burlington Northern & Santa Fe Ry. Co. v. White,* 548 U.S. 53 (2006).

Moreover, this harassment deprived Z "of access to the educational opportunities or benefits provided by the school." *Davis*, 526 U.S. at 650. As the Fifth Circuit has stated: "The harassment must have a concrete, negative effect on the victim's education, such as creating a disparately hostile educational environment relative to the victim's peers, forcing the student to change his or her study habits or to move to another district, or lowering the student's grades." *Fennell*, 804 F.3d at 410. Here, the alleged harassment had a concrete, negative effect on Z's education. Z had to be hospitalized for severe depression and suicidal ideation due to the harassment, and ultimately withdrew from MMS entirely. These facts are sufficient to raise a plausible claim that Z was deprived of educational opportunities by the "severe, pervasive, and objectively offensive" harassment at MMS. *See id.* (holding that facts were sufficient to raise a genuine dispute that

plaintiffs were deprived of educational opportunities by the harassment where students suffered from anxiety, required alternative study arrangements, and withdrew from school).

### 2. Deliberate Indifference

School districts may be liable under Title VI where they are deliberately indifferent to known acts of student-on-student racial harassment and the harasser is under the school's disciplinary authority. *Davis*, 526 U.S. at 646-47; *Fennell*, 804 F.3d at 408; *see also Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022, 1034 (9th Cir. 1998) ("Once on notice of the problem, a school district 'has a legal duty to take reasonable steps to eliminate' a racially hostile environment.") (quoting Racial Incidents and Harassment Against Students at Educational Institutions; Investigative Guidance, 59 Fed. Reg. 11,450 (March 10, 1994)). A school district is considered deliberately indifferent "only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648. "That is a high bar, and neither negligence nor mere unreasonableness is enough." *Sanches*, 647 F.3d at 167. "Schools are not required to remedy the harassment or accede to a parent's remedial demands." *Id.* at 167-68. In addition, "[o]fficials may avoid liability under a deliberate indifference standard by responding reasonably to a risk of harm, 'even if the harm ultimately was not averted.'" *Doe ex rel. Doe v. Dallas Indep. Sch. Dist.*, 220 F.3d 380, 384 (5th Cir. 2000) (quoting *Farmer v. Brennan*, 511 U.S. 825, 844 (1994)).

Plaintiffs allege that AISD was deliberately indifferent to the student-on-student harassment because, despite Plaintiffs' repeated complaints, school officials failed to investigate their complaints or do anything to stop the racial harassment and bullying of Z. Plaintiffs allege that Principal Lopez told Menzia on September 26, 2017, that the bullying and harassment would be addressed, but it never was addressed and continued to occur on a daily basis. Dkt. 24 at 4.

Plaintiffs contend that the school never properly investigated the alleged racial harassment and failed to meet with Z and the Harassers to discover whether Z's complaints were valid. Plaintiffs also contend that the school failed to provide Z with counseling services, an aide, or social skills training. Plaintiffs also allege that the school failed to implement appropriate safety measures to stop the bullying and prevent future bullying and harassment.

AISD argues that because Plaintiffs acknowledge that Principal Lopez eventually investigated Plaintiffs' complaints, regardless of whether the bullying continued, Plaintiffs "conclusively plead[ ] that an investigation was still undertaken, negating deliberate indifference." Dkt. 21 at 16. While it is true that a school is not required to *remedy* the harassment to avoid liability, the school still must respond "reasonably" to the complaints of harassment. *Doe*, 220 F.3d at 384. As noted, Plaintiffs acknowledge that Menzia received a letter from Principal Lopez—after Z was involved in the physical altercation with the Harassers on October 17, 2017—stating: "I have concluded that the report[ed] conduct does not constitute 'bullying' or 'harassment' as defined in law and District Policy." Dkt. 17 ¶ 54. It is not clear whether this "investigation" was in response to Plaintiffs' complaints about racial harassment or the October 17 incident. In addition, Plaintiffs specifically allege that despite their repeated complaints about the bullying and harassment of Z due to her race and national origin, "[n]o investigation was done pertaining these complaints." Dkt. 24 at 1. In fact, as noted above, Plaintiffs contend that Principal Lopez never met with Plaintiffs and the Harassers to discuss the harassment, and never referred Plaintiffs' complaints to the Title VI Coordinator or anyone else at AISD. Plaintiffs allege that Principal Lopez and the other school officials "did absolutely nothing" to stop the daily harassment and bullying of Z. Dkt. 24 at 16. As noted, the bullying and harassment continued, and Z eventually was hospitalized for her severe depression and suicidal ideation, allegedly from the bullying.

A school district "is liable for its failure to act if the need for intervention was so obvious, or if inaction was so likely to result in discrimination, that 'it can be said to have been deliberately indifferent to the need.'" *Monteiro*, 158 F.3d at 1034 (quoting *Canton*, 489 U.S. at 390). "It goes without saying that being called a 'nigger' by your white peers (or hearing that term applied to your Black classmates) exposes Black children to a 'risk of discrimination' that is so substantial and obvious that a failure to act can only be the result of deliberate indifference." *Id.*

Plaintiffs' allegations support a plausible claim that the school officials did not respond reasonably to Z's complaints of racial harassment and, therefore, were deliberately indifferent to the harassment. *See also Davis*, 526 U.S. at 654 (holding that student alleged deliberate indifference where school district "made no effort whatsoever either to investigate *or* to put an end to the harassment"); *Monteiro*, 158 F.3d at 1034 (finding that school district was deliberately indifferent where district officials refused to accept the complaints regarding racial problems at or to put a stop to the students' racist conduct). Accordingly, Plaintiffs have stated a plausible claim for relief against AISD under Title VI.

### B.  42 U.S.C. § 1983

In their First Amended Complaint, Plaintiffs also allege a Fourteenth Amendment due process claim under § 1983 against AISD, based on its alleged failure to train and supervise its employees on how to address complaints of racial discrimination. Section 1983 provides that: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . ." 42 U.S.C. § 1983. Municipal entities such as AISD qualify as "persons" under § 1983. *Monell v. Dep't of Soc. Servs.*, 436 U.S.

11

658, 690 (1978). Under *Monell* and its progeny, however, "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.* at 691. Accordingly, "isolated unconstitutional actions by municipal employees will almost never trigger liability"; rather, "the unconstitutional conduct must be directly attributable to the municipality through some sort of official action or imprimatur." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001).

Municipal liability under § 1983 requires proof of three elements: "a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom." *Monell*, 436 U.S. at 694. "The 'official policy' requirement was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986). The policymaker is liable if an official policy itself is unconstitutional or the policy was adopted with "deliberate indifference" to its known or obvious consequences. *Fennell*, 804 F.3d at 412. "An official policy may take various forms, including a widespread practice that is so common and well-settled as to constitute a custom that fairly represents municipal policy." *Id.* at 413 (internal quotation marks omitted). "Regardless of its form, the policymaker must have actual or constructive knowledge of the official policy or custom." *Id.* It is important to emphasize that "[t]he policymaker must have final policymaking authority." *Rivera v. Houston Indep. Sch. Dist.*, 349 F.3d 244, 247 (5th Cir. 2003). Therefore, to prevail against a school district like AISD, "a plaintiff must show that the district's final policymaker acted with deliberate indifference in maintaining an unconstitutional policy that caused the plaintiff's injury." *Doe v. Edgewood Indep. Sch. Dist.*, 964 F.3d 351, 364–65 (5th Cir. 2020).

The Supreme Court has stated that "whether an official had final policymaking authority is a question of state law." *Pembaur*, 475 U.S. at 483. It is clear that under Texas law, the final policymaking authority in an independent school district rests with the district's board of trustees. *Doe*, 964 F.3d at 365; *Jett v. Dallas Indep. Sch. Dist.*, 7 F.3d 1241, 1245 (5th Cir. 1993); *see also* TEX. EDUC. CODE ANN. § 11.151(b) ("The trustees as a body corporate have the exclusive power and duty to govern and oversee the management of the public schools of the district."). Thus, the final policymaker for AISD is the AISD Board of Trustees.

Plaintiffs have failed to allege that the AISD Board of Trustees was ever aware of the alleged bullying and harassment of Z. In fact, in their First Amended Complaint, Plaintiffs repeatedly claim that the MMS school officials failed to notify the Board, Superintendent, or AISD Title VI Coordinator. Accordingly, even assuming that the alleged failures to train and supervise existed among AISD employees, "[t]here is no evidence that the AISD Board knew of this behavior and condoned it." *Fennell*, 804 F.3d at 413 (quoting *Rivera*, 349 F.3d at 250).

Plaintiffs have failed to allege that the Board ever had knowledge of the alleged discrimination in this case. Moreover, Plaintiffs acknowledge that the Board "has long had" official policies prohibiting discrimination, harassment and bullying. Dkt. 17 ¶¶ 21-24. Thus, the Board's official policies "suggest a policy that was, at minimum, antagonistic" to such bullying and harassment based on race. *Fennell*, 804 F.3d at 413 (quoting *Rivera*, 349 F.3d at 250). Because Plaintiffs have failed to show that the AISD Board of Trustees acted with deliberate indifference in maintaining an unconstitutional policy that caused the plaintiff's injuries in the case, Plaintiffs' § 1983 claims should be dismissed. *Id.*

## IV. Recommendation

Based on the foregoing, the undersigned **RECOMMENDS** that Austin Independent School District's Motion to Dismiss Plaintiffs' First Amended Complaint (Dkt. 21) is **GRANTED IN PART** and **DENIED IN PART**. The undersigned **RECOMMENDS** that the District Court **GRANT** the Motion to Dismiss Plaintiffs' claims under 42 U.S.C. § 1983, but **DENY** the Motion with regard to Plaintiffs' claims under Title VI of the Civil Rights Act of 1964.

**IT IS FURTHER ORDERED** that this case be removed from the Magistrate Court's docket and returned to the docket of the Honorable Lee Yeakel.

## V. Warnings

The parties may file objections to this Report and Recommendation. A party filing objections must specifically identify those findings or recommendations to which objections are being made. The District Court need not consider frivolous, conclusive, or general objections. *See Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987). A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from de novo review by the District Court of the proposed findings and recommendations in the Report and, except on grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 150-53 (1985); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

**SIGNED** on August 6, 2020.

_____
SUSAN HIGHTOWER
UNITED STATES MAGISTRATE JUDGE